[No. 12591.   Department One.   July 28, 1915.]

PUGET SOUND WAREHOUSE COMPANY, *Appellant,* LAWRENCE L. DAVISON *et al., Interveners and Respondents,* v. E. E. LaHUE *et al., Defendants,* JONES-SCOTT COMPANY, *Garnishee Defendant.*[1]

ASSIGNMENTS—PROCEEDS OF CROP SALE—AGREEMENT—TRUST—EVIDENCE—SUFFICIENCY—CONSIDERATION.   Where a cropping tenant, indebted to his landlord on a promissory note, and to a warehouseman for sacks, stored the crop of wheat in the warehouse and deposited the warehouse receipts in a bank where the tenant's note was held as collateral, and these parties, together with others claiming the right to liens for harvesting the crop, got together and agreed that the wheat should be sold, which was done, and part payment made by check to the bank holding the wheat receipts, one-third of which was supposed to belong to the tenant, the fact that the memorandum of sale of the wheat was made by the tenant as his own wheat, instead of for his creditors, does not show that there was no assignment of the fund or trust for the labor claimants for harvesting, where it further appears that it was customary for the grower to make the sale of his own wheat, that the indorsed wheat receipts were delivered to the tenant for that purpose, that he was to bring the money to the bank for distribution, and in the settlement the labor claims for harvesting were spoken of as being the first to be paid; the relation of debtor and creditor being sufficient consideration for the understanding to pay such labor claims.

Appeal from a judgment of the superior court for Walla Walla county, Mills, J., entered February 14, 1914, upon findings in favor of the interveners, in garnishment proceedings, tried to the court.   Affirmed.

*J. G. Thomas* and *W. A. Toner,* for appellant.

*Sharpstein & Sharpstein,* for interveners and respondents.

[1]Reported in 150 Pac. 630.

CHADWICK, J.—Defendant E. E. LaHue was a tenant of the defendant A. B. Olson for the crop year of 1912. LaHue was indebted to Olson in a sum exceeding $4,000. At the times hereinafter mentioned, he was also indebted to plaintiff in the sum of $315 for sacks, and to the interveners in a large sum for harvesting his crops. After the harvest, LaHue stored the grain in the warehouse of plaintiff, taking, as we gather from the testimony, ordinary warehouse receipts with no notation of any amount due for advances. LaHue indorsed the receipts and took them to the Third National Bank, where Mr. Olson did business and where the LaHue note was held as collateral. They there remained until some time in October, when the interveners, becoming more insistent in their demands for the amount due them for harvesting, the parties LaHue, Olson, Davison and Paxton, went to the bank and the matter was taken up with Mr. Kellough, the president of the bank, who advised a sale of the wheat. Whereupon the wheat was sold to Jones-Scott Company, the garnishee defendant. A check in part payment was drawn in favor of the bank for $1,850. The wheat was not No. 1 and was bought subject to terminal grades. The balance of the purchase price was reserved until the grain was shipped and graded at tidewater.

On December 12, the Jones-Scott Company sent the receipts over to the plaintiff and ordered the grain shipped out. It was informed that it would not do so until the sack bill was paid. The manager of plaintiff asked Mr. Kellough to accept an order for the sack bill, which request was refused. He then obtained an order on the garnishee, signed by LaHue and Olson, to pay the sack bill out of the further proceeds of the grain. This he asked the Jones-Scott Company to accept. It refused to do so unless Mr. Kellough would sign it. At this point it seems that the manager of the Jones-Scott Company advised a garnishment proceeding, it being certain there would be a balance due on the wheat over the amount paid. Plaintiff accordingly instituted this suit, Davison and

the Paxton-Stine Company intervening and setting up owner-ship in the fund, which has since been paid into court.

It is the contention of the interveners that they became parties to the agreement that the wheat should be sold and that they be paid out of the proceeds in order to save filing a lien which they then threatened. Inasmuch as the case, in so far as the interveners are concerned, seems inevitably to turn on the testimony of Mr. Kellough, we shall quote from it as abstracted by appellant:

"Mr. Olson had a mortgage and witness' bank was holding the LaHue notes as collateral security against Mr. Olson. Mr. LaHue brought the receipts in as soon as he harvested. Afterwards Mr. Davison, Mr. Paxton and Mr. Brotherton came in and claimed they had not been paid for their labor and wanted the money. They were going to put a lien on the wheat unless some arrangement was made whereby they had got their money. Witness talked it over with Olson and finally they got together and decided that the wheat be sold and the money paid to Davison and Paxton as assignees. LaHue brought Davison and Olson in. Witness was holding the wheat receipts then and one-third of it was supposed to belong to Olson. The receipts were indorsed. Regarding the sale, Messrs. LaHue, Davison and Paxton came in and decided to sell the wheat and witness handed the receipts to LaHue with the understanding that LaHue should sell the wheat at a stipulated price. He was to bring the money back to the bank and witness was to pay the money *pro rata* as far as it would go to Paxton-Stine Co. and Davison. . . .

"LaHue went to sell the wheat because the wheat was in his name. It is customary for a man to sell his own wheat. Witness remembers having talked with Mr. Jones about the sack bill and believes that Mr. Jones came to the witness and said he had a sack bill against the wheat and wanted witness to sign order. Witness told him he could do nothing for him as he had no right to sign the order. Witness said that the labor had not been paid for yet and that it would come first. Witness was sure he talked about the labor claim. When asked whether witness told Mr. Jones anything about holding the wheat as trustee for anyone, witness answers: 'No, sir;

there was no mention of that. I said the labor had not been paid for, and had to be paid for first'."

LaHue also admits on cross-examination:

"When asked whether it was not the understanding that Mr. Kellough should pay the harvest expenses out of this money he said that it was implied in a way that the wheat was to go towards paying the expense proposition, and that was one reason the money was handled through the Third National Bank, but not the only reason."

Upon these facts, a judgment was entered in favor of the interveners.

It is insisted that there was no assignment of the fund in favor of the interveners and that Mr. Kellough was not a trustee holding a fund for their benefit. The first reliance is that the wheat was sold by LaHue as his own wheat, as evidenced by the memorandum of sale. Standing alone, this might have weight, but when considered in the light of Mr. Kellough's testimony that Mr. LaHue, who admittedly had no other interest in the wheat except to get the top market price, was given the receipts to deliver to the purchaser and return the proceeds, and the further fact that the check was made in favor of the bank, we think the inferences flowing from the memorandum are entirely overcome.

The question of equitable assignment is not in the case. As between the parties, LaHue and the interveners, it was clearly a lawful thing, as between themselves and as against third persons having no lien, to sell the grain upon an understanding that the money should, when collected, be paid to the interveners. The relation of debtor and creditor is sufficient to sustain the transaction, and it can make no difference to third parties whether the bank or Mr. Kellough is called a trustee, agent, or an assignee of LaHue for the benefit of respondents.

We find no error. Affirmed.

MORRIS, C. J., CROW, MOUNT, and HOLCOMB, JJ., concur.